ORIGINAL

IN THE UNITED STATES
COURT OF FEDERAL CLAIMS

FILED
MAY 11 2004
U.S. COURT OF FEDERAL CLAIMS

BEACH HOUSE DEVELOPMENT COMPANY,
An Ohio Limited Partnership,
5025 Swetland Court
Cleveland, Ohio 44143

Plaintiff,

v.

THE UNITED STATES
OF AMERICA,

Defendant.

04-806C

COURT OF FEDERAL CLAIMS NO.

COMPLAINT

## Preliminary Statement

1. Plaintiff Beach House Development Company ("Beach House") brings this action for damages resulting from the failure of the Defendant, United States of America, acting through the Department of Housing and Urban Development ("HUD"), to provide for automatic annual rent increases in 1998, 1999, 2000, 2001 and 2002 for the Lakeshore Village project ("Lakeshore Village"). Pursuant to the Housing Assistance Payment Contract ("HAP Contract") entered into between Beach House and HUD, Beach House is entitled to annual rent increases for the subject property more fully described herein. HUD and its agents have breached the HAP Contract by their failure and subsequent refusal to grant the rent increases, mandated by the HAP Contract, resulting in damages to Beach House in the amount of at least $453,000.

**Jurisdiction**

2. This Court has subject matter jurisdiction pursuant to the provisions of the Tucker Act, 28 U.S.C. § 1491, as this claim is founded upon breaches of an express contract entered into between Beach House and HUD.

**Parties**

3. Beach House is an Ohio Limited Partnership.

4. Beach House is the owner of a certain property known as Lakeshore Village which is located at 16151 Lake Shore Blvd., Cleveland, Ohio and consists of 102 two-bedroom and 6 three-bedroom units.

5. HUD is an agency of the United States of America and at all times relevant to the allegations in this Complaint was acting as an agent of the United States of America. The actions of HUD are therefore imputed to the United States of America.

**Statement of Operative Facts**

6. Pursuant to the United States Housing Act of 1937, 42 U.S.C. 1437, *et seq.*, specifically 42 U.S.C. 1437f ("Section 8"), and the Department of Housing and Urban Development Act, 42 U.S.C. 3531, *et seq.*, Beach House entered into a HAP Contract with HUD for Lakeshore Village ("Lakeshore Village HAP Contract"), which was designated Lakeshore Village Project, HUD project number OH 12-002-012. Said Contract was effective October 4, 1982, for 60 units and October 25, 1982, for 48 units. (See Lakeshore Village HAP Contract attached as Exhibit A.)

7. Pursuant to the terms of the Lakeshore Village HAP Contract, HUD was to provide housing assistance payments to Beach House for units in the Lakeshore Village Project under lease by lower-income families.

8. The Lakeshore Village HAP Contract set forth the initial contract rent for each unit at $567 for two bedroom units and $640 for three bedroom units per month ("Initial Contract Rent"). Included within that Initial Contract Rent was an initial difference between that rent and fair market rent for comparable unassisted units of 20%.

9. Pursuant to Section 1.6(f)(1) of the Lakeshore Village HAP Contract, Beach House was required to submit monthly requests to HUD for housing assistance payments.

10. Under the provisions of 42 U.S.C. § 1437f(c)(1), the housing assistance payments provided by HUD were designed to reimburse Beach House for the difference between the rent called for under the Lakeshore Village HAP Contract for each unit ("Contract Rent") and the amount paid by each leasing family.

11. Section 1.8(b) of the Lakeshore Village HAP Contract, entitled "Automatic Annual Adjustments," contained a mechanism whereby the Contract Rent due Beach House was to be increased on an annual basis and provided in full as follows:

> (1) *Automatic Annual Adjustment Factors will be determined by the Government at least annually; interim revisions may be made as market conditions warrant. Such Factors and the basis for their determination will be published in the Federal Register. These published Factors will be reduced appropriately by the Government where utilities are paid directly by the Families.*
>
> (2) *On each anniversary date of the Contract, the Contract Rents shall be adjusted by applying the applicable Automatic Annual Adjustment Factor most recently published by the Government. Contract Rents may be adjusted upward or downward, as may be appropriate; however, in no case shall the*

> *adjusted Contract Rents be less than the Contract Rents on the effective date of the Contract.*

12. Section 1.8(d) of the Lakeshore Village HAP Contract further provided:

> (d) *Overall Limitation. Not withstanding any other provisions of this Contract, adjustments as provided in this Section shall not result in material differences between the rents charged for assisted and comparable unassisted units, as determined by the Government; provided, that this limitation shall not be construed to prohibit differences in rents between assisted and comparable unassisted units to the extent that such differences may have existed with respect to the initial Contract Rents.*

13. On September 28, 1994, Congress enacted amendments to the United States Housing Act of 1937 including an amendment to 42 USCA §1437f(c)(2)(A) which limited adjustment of rents under HAP Contracts to situations where the owner demonstrates that the adjustment would not exceed comparable rents for unassisted units and required the deduction of one percent from the automatic annual adjustment factor ("AAAF") for units occupied by the same family ("Amendments"). Said Amendments were effective only for fiscal 1995 but were continued from year to year until they were made permanent for fiscal 1999 and thereafter.

14. After enactment of the Amendments, HUD issued Directive 95-12 ("Directive") to implement the Amendments. If existing contract rents exceeded HUD published fair market rents for the area, in order to receive an adjustment of rent, the Directive required owners to submit comparability studies showing comparable rents at least five percent above the existing rent. The Directive limited adjustments to the sum of comparable rent and initial difference. The Directive also provided for deduction of one percent from the AAAF for units occupied by the same families during the year and

provided that adjustments in rent would only take effect 60 days from the date of application for same. Said Directive was effective only for fiscal 1995 but was continued from year to year until it was made permanent for fiscal 1999 and thereafter.

**Count I**

**(Breach of Contract Annual Rent Adjustment)**

15. Between contract inception and 1994, the monthly per unit Contract Rent for Lakeshore Village was increased pursuant to the provisions of Section 1.8(b) of the Lakeshore Village HAP Contract from $567 to $662 for two bedroom units and from $640 to $779 for three bedroom units.

16. Since the 1994 Contract Rent adjustment, the Government has published Automatic Annual Adjustment Factors each year.

17. Based upon the provisions of the Lakeshore Village HAP Contract cited above, Beach House was entitled to receive automatic Contract Rent adjustments for the years 1995 through 2002, which HUD has repeatedly failed to provide.

18. The failure by HUD to adjust the Contract Rents on the Lakeshore Village HAP Contract's anniversary dates resulted in substantially lower housing assistance payments being made by HUD to Beach House for Lakeshore Village since HUD's first failure to adjust the Contract Rent in 1995.

19. Despite Beach House's compliance with the express provisions of the Lakeshore Village HAP Contract, HUD continues to refuse to make retroactive rent adjustments for the years 1995 through 2002.

20. By its actions, HUD has breached the express terms of the Lakeshore Village HAP Contract in failing to grant automatic annual adjustments in the Contract Rent for the years 1995 through 2002.

21. As a result of HUD's breach of the HAP Contract between Beach House and HUD, Beach House has been damaged in an approximate amount of $453,000.

**Count II**

**(Breach of Contract - One Percent Reduction)**

22. Beach House realleges and revers the allegations contained in Paragraphs 1-21 of this Complaint as if fully rewritten herein.

23. HUD further breached the Lakeshore Village HAP Contract by reducing the AAAF by one percent for units occupied by the same tenant for the years 1995 through 2002.

**Count III**

**(Breach of Contract - Over-all Limitation)**

24. Beach House realleges and revers the allegations contained in Paragraphs 1-23 of this Complaint as if fully rewritten herein.

25. HUD further breached the Lakeshore Village HAP Contract by failing to apply the appropriate Overall Limitation of 120% of the sum of comparable rent and initial difference for the years 1995 through 2002.

**Count IV**

**(Breach of Contract - Comparability Studies and Time Limits)**

26. Beach House realleges and revers the allegations contained in Paragraphs 1-25 of this Complaint as if fully rewritten herein.

27. HUD further breached the Lakeshore Village HAP Contract by its application of the Directive's 60-day time limit and the requirement of Beach House to obtain comparability studies in order to obtain annual rent adjustments for the years 1995 through 2002.

28. On April 2, 2004, Beach House made a request to HUD for payment of the additional HAP payments alleged in the within Complaint and submitted the comparability studies for the years 1998 through 2002 and other documents required by the Directive. On April 23, 2004, said request was denied by HUD.

WHEREFORE, Beach House prays that this Court award it money damages in the amount of at least $453,000, all additional money damages suffered by Beach House from the filing of the within Complaint until entry of judgment, such additional other amounts that are proved at trial, together with pre- and post-judgment interest, attorney fees and any such other relief that the Court deems proper.

Respectfully submitted,

Dated: May 10, 2004

Fred J. Livingstone
TAFT, STETTINIUS & HOLLISTER LLP
3500 BP Tower
200 Public Square
Cleveland, Ohio 44114-2302
(216) 241-2838

Attorney for Plaintiff

Of counsel:
Mark J. Valponi
Majeed M. Makhlouf

U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT
SECTION 8 HOUSING ASSISTANCE PAYMENTS PROGRAM
NEW CONSTRUCTION

PART I OF THE

# HOUSING ASSISTANCE PAYMENTS CONTRACT

PRIVATE-OWNER OR PHA-OWNER PROJECT

| HAP CONTRACT LIST NUMBER AND DATE: | PROJECT NUMBER: |
|---|---|
| C-82-389, 5/5/82 | OH-12-0002-012 |

This Housing Assistance Payments Contract ("Contract") is entered into by and between the United States of America acting through the Department of Housing and Urban Development ("Government"), and Beach House Development Company ("Owner"), pursuant to the United States Housing Act of 1937 ("Act"), 42 U.S.C. 1437, et seq., and the Department of Housing and Urban Development Act, 42 U.S.C. 3531, et seq.

The parties hereto agree as follows:

1.1 SIGNIFICANT DATES AND OTHER ITEMS: CONTENTS OF CONTRACT.

a. Effective Date of Contract. The effective date of this Contract is SEE EXECUTION OF CONTRACT IN STAGES, 19___. [This date shall be no earlier than the date of Government acceptance of the project.]

b. Initial Term of Contract. The initial term of this Contract (see Section 1.4a) shall be 5 years (not to exceed five years), beginning with the effective date of this Contract and ending __________, 19___.

c. Number and Length of Optional Additional Terms. The number and length of optional additional terms (see Section 1.4a) shall be 3 terms of 5 years each (not to exceed five years each).

d. Maximum Total Term of Contract. The maximum total term of this Contract for any unit, including all renewals (see Section 1.4a) shall be 20 years. [Insert 20, except that (1) in the case of a project owned by, or financed by a loan or loan guarantee from, a State or local agency, insert the number, not to exceed 40, which will provide a term ending with the scheduled maturity date for the last payment under such financing, and (2) in the case of a mobile homes project, insert number as authorized by the Government pursuant to 24 CFR, Section 880.109, not to exceed 20.]

e. Fiscal Year. The ending date of each Fiscal Year (see Section 1.4b) shall be June 30 [insert March 31, June 30, September 30, or December 31, as determined by the Government].

f. Maximum Housing Assistance Commitment. The maximum amount of the commitment for housing assistance payments under this Contract (see Section 1.5a) is $ 5684,360.00 per annum.

g. Contents of Contract. This Contract consists of Part I, Part II, and the following exhibits:

Exhibit A: The Schedule showing the number of units by size ("Contract Units") and their applicable rents ("Contract Rents");

Exhibit B: The project description;

Exhibit C: The statement of services, maintenance and utilities to be provided by Owner;

Exhibit D: The Affirmative Fair Housing Marketing Plan, if applicable; and

Additional exhibits: [Specify additional exhibits, if any. If none, insert "None."]

Attachment A

This Contract, including such exhibits, comprises the entire agreement between the parties hereto with respect to the matters contained herein, and neither party is bound by any representations or agreements of any kind except as contained herein or except agreements entered into in writing which are not inconsistent with this Contract.

1.2 OWNER'S WARRANTIES.

a. Legal Capacity. The Owner warrants that he has the legal right to execute this Contract and to lease dwelling units covered by this Contract.

b. Completion of Work. The Owner warrants that the project as described in Exhibit B is in good and tenantable condition and that the project has been completed in accordance with the terms and conditions of the Agreement to Enter into Housing Assistance Payments Contract ("Agreement") or will be completed in accordance with the terms on which the project was accepted. The Owner further warrants that he will remedy any defects or omissions covered by this warranty if called to his attention within 12 months of the effective date of this Contract. The Owner and the Government agree that the continuation of this Contract shall be subject to the conditions set forth in Section 1.4f of the Agreement.

1.3 FAMILIES TO BE HOUSED: GOVERNMENT ASSISTANCE.

a. Families To Be Housed. The Contract Units are to be leased by the Owner to eligible Lower-Income Families ("Families") for use and occupancy by such Families solely as private dwellings.

b. Government Assistance.

(1) The Government hereby agrees to make housing assistance payments on behalf of Families for the Contract Units, to enable such Families to lease Decent, Safe, and Sanitary housing pursuant to section 8 of the Act. Such housing assistance payments shall equal the difference between the Contract Rents for units leased by Families and the portion of such rents payable by Families as determined by the Owner in accordance with schedules and criteria established by the Government.

(2) If there is an Allowance for Utilities and Other Services and if such Allowance exceeds the Gross Family Contribution, the Owner shall pay the Family the amount of such excess on behalf of the Government upon receipt of funds from the Government for that purpose.

1.4 TERM OF CONTRACT; FISCAL YEAR.

a. Term of Contract.

[Alternative provisions—incorporate alternative 1 or 2, as applicable.]

Alternative 1—General:

The initial term of this Contract shall be as stated in Section 1.1b. This Contract may be renewed, at the sole option of the Owner, for the number and length of additional terms started in Section 1.1c, provided that the total Contract term for any unit, including all renewals, shall not exceed the number of years stated in Section 1.1d. Renewal shall be automatic unless the Owner notifies the Government, no later than 60 days prior to the expiration of the current term, of his intention not to renew. If the project is completed in stages, the dates for the initial term and renewal terms shall be separately related to the units in each stage; Provided, however, that the total Contract term for all the stages, beginning with the effective date of the Contract with respect to the first stage, shall not exceed the total Contract term stated in Section 1.1d, plus two years. In any case where the project is owned by, or financed by a loan or loan guarantee from, a State or local agency, the housing assistance payments pursuant to this Contract with respect to any dwelling unit shall be payable over a period not to exceed 40 years.

Alternative 2—For mobile homes project:

In the case of mobile homes, the initial term of this Contract for each mobile home shall be as stated in Section 1.1b. This Contract shall be renewed, as may be mutually agreed upon by the Owner and the Government, with respect to any mobile home, for the number and length of additional terms as stated in Section 1.1c, provided that the total Contract term for any mobile home, including all renewals, shall not exceed the number of years stated in Section 1.1d. Renewals shall become effective only if either party gives written notice, no later than 60 days prior to the expiration of the current term, of his desire to renew, and the other party concurs or fails to object before the expiration of the current term. If the project is completed in stages, the dates for the initial term and renewal terms shall be separately related to the mobile homes in each stage: Provided, however, that the total Contract term for all the stages, beginning with the effective date of the Contract with respect to the first stage, shall not exceed the total Contract term stated in Section 1.1d, plus two years. For purposes of this paragraph a, the term "mobile home" means the original mobile home and any replacement(s), combined.

b. Fiscal Year. The Fiscal Year for the project shall be the 12-month period ending on the date stated in Section 1.1e: Provided, however, that the first Fiscal Year for the project shall be the period beginning with the effective date of the Contract and ending on the last day of said established Fiscal Year which is not less than 12 months after such effective date. If the first Fiscal Year exceeds 12 months, the maximum total annual housing assistance payment in Section 1.5a may be adjusted by the addition of the pro rata amount applicable to the period of operation in excess of 12 months.

1.5 MAXIMUM HOUSING ASSISTANCE COMMITMENT; PROJECT ACCOUNT.

a. Maximum Housing Assistance Commitment. Notwithstanding any other provisions of this Contract (other than paragraph b of this Section) or any provisions of any other contract between the Government and the Owner, the Government shall not be obligated to make and shall not make any housing assistance payments under this Contract in excess of the amount per annum stated in Section 1.1f: Provided, however, that this amount shall be reduced commensurately with any reduction in the number of Contract Units or in the Contract Rents or pursuant to any other provisions of this Contract.

b. Project Account. In order to assure that housing assistance payments will be increased on a timely basis to cover increases in Contract Rents or decreases in Family Incomes:

(1) A Project Account shall be established and maintained, in an amount as determined by the Government consistent with its responsibilities under section 8(c)(6) of the Act, out of amounts by which the maximum Contract commitment per year exceeds amounts paid under the Contract for any Fiscal Year. This account shall be established and maintained by the Government as a specifically identified and segregated account. To the extent funds are available in said account, the maximum total annual housing assistance payments for any Fiscal Year may exceed the maximum amount stated in paragraph a of this Section to cover increases in Contract Rents or decreases in Family Incomes (see Section 1.8). Any amount remaining in said account after payment of the last housing assistance payment with respect to the project shall be applied by the Government in accordance with law.

(2) Whenever the Government approved estimate of the required Annual Contribution exceeds the maximum Contract commitment then in effect and would cause the amount in the Project Account to be less than an amount equal to 40 percent of such maximum Contract commitment, the Government shall, within a reasonable period of time, take such additional steps authorized by section 8(c)(6) of the Act as may be necessary to carry out this assurance, including (as provided in that section of the Act) "the reservation of annual contributions authority for the purpose of amending housing assistance contracts or the allocation of a portion of new authorizations for the purpose of amending housing assistance contracts."

1.6 HOUSING ASSISTANCE PAYMENTS TO OWNERS.

a. General.

(1) Housing assistance payments shall be paid to the Owner for units under lease by Families in accordance with the Contract. The housing assistance payment will cover the difference between the Contract Rent and that portion of said rent payable by the Family as determined in accordance with the Government-established schedules and criteria.

(2) The amount of housing assistance payment payable on behalf of a Family and the amount of rent payable by such Family shall be subject to change by reason of changes in Family Income, Family composition, or extent of exceptional medical or other unusual expenses, in accordance with the Government-established schedules and criteria; or by reason of adjustment by the Government of any applicable Allowance for Utilities and Other Services. Any such change shall be effective as of the date stated in a notification of such change to the Family.

b. Vacancies During Rent-up. If a Contract Unit is not leased as of the effective date of the Contract, the Owner shall be entitled to housing assistance payments in the amount of 80 percent of the Contract Rent for the unit for a vacancy period not exceeding 60 days from the effective date of the Contract, provided that the Owner (1) commenced marketing and otherwise complied with Section 1.3b of the Agreement, (2) has taken and continues to take all feasible actions to fill the vacancy, including, but not limited to, contacting applicants on his waiting list, if any, requesting the Public Housing Agency ("PHA") and other appropriate sources to refer eligible applicants, and advertising the availability of the unit, and (3) has not rejected any eligible applicant, except for good cause acceptable to the Government.

c. Vacancies After Rent-up.

(1) If a Family vacates its unit (other than as a result of action by the Owner which is in violation of the Lease or the Contract or any applicable law), the Owner shall receive housing assistance payments in the amount of 80 percent of the Contract Rent for a vacancy period not exceeding 60 days; Provided, however, that if the Owner collects any of the Family's share of the rent for this period in an amount which, when added to the 80 percent payments, results in more than the Contract Rent, such excess shall be payable to the Government or as the Government may direct. (See also Section 1.9b.) The Owner shall not be entitled to any payment under this subparagraph unless he: (i) immediately upon learning of the vacancy, has notified the Government of the vacancy or prospective vacancy and the reasons for the vacancy, and (ii) has taken and continues to take the actions specified in paragraphs b(2) and b(3) of this Section.

(2) If the Owner evicts a Family, he shall not be entitled to any payment under paragraph c(1) of this Section unless the request for such payment is supported by a certification that (i) he gave such Family a written notice of the proposed eviction, stating the grounds and advising the Family that it had 10 days within which to present its objections to the Owner in writing or in person and (ii) the proposed eviction was not in violation of the Lease or the Contract or any applicable law.

d. Limitation on Payments for Vacant Units. The Owner shall not be entitled to housing assistance payments with respect to vacant units under this Section to the extent he is entitled to payments from other sources (e.g., payments for losses of rental income incurred for holding units vacant for relocatees pursuant to Title I of the Housing and Community Development Act of 1974 or payments under Section 1.9b of this Contract).

e. Government Not Obligated for Family Rent. The Government has not assumed any obligation for the amount of rent payable by any Family or the satisfaction of any claim by the Owner against any Family other than in accordance with Section 1.9b of this Contract. The financial obligation of the Government is limited to making housing assistance payments on behalf of Families in accordance with this Contract.

f. Owner's Monthly Requests for Payments.

(1) The Owner shall submit monthly requests to the Government for housing assistance payments. Each such request shall set forth: (i) the name of each Family and the address and/or number of the unit leased by the Family; (ii) the address and/or the number of units, if any, not leased to Families for which the Owner is claiming payments; (iii) the Contact Rent as set forth in *Exhibit* A for each unit for which the Owner is claiming payments; (iv) the amount of rent payable by the Family leasing the unit (or, where applicable, the amount to be paid the Family in accordance with Section 1.3b(2); and (v) the total amount of housing assistance payments requested by the Owner.

(2) Each of the Owner's monthly requests shall contain a certification by him that to the best of his knowledge and belief (i) the dwelling units are in Decent, Safe, and Sanitary condition, (ii) all the other facts and data on which the request for funds is based are true and correct, (iii) the amount requested has been calculated in accordance with the provisions of this Contract and is payable under the Contract, and (iv) none of the amount claimed has been previously claimed or paid.

(3) If the Owner has received an excessive payment, the Government, in addition to any other rights to recovery, may deduct the amount from any subsequent payment or payments.

(4) The Owner's monthly requests for housing assistance payments shall be made subject to penalty under 18 U.S.C. 1001, which provides, among other things, that whoever knowingly and willfully makes or uses a document or writing containing any false, fictitious, or fraudulent statement or entry, in any matter within the jurisdiction of any department or agency of the United States, shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

g.[1] Recoupment of Savings in Financing Cost.

(1) In the event that interim financing is continued after the first year of the term of the Contract and the debt service of the interim financing for any period of three months, after such first year, is less than the anticipated debt service under the permanent financing on which the Contract Rents were based, an amount reflecting the savings in financing cost, computed in accordance with paragraph g(2) of this Section, shall be credited by the Government to the Project Account, and withheld from housing assistance payments to the Owner. If during the course of the same year there is any period of three months in which the debt service is greater than the anticipated debt service under the permanent financing, an adjustment shall be made so that only the net amount of savings in financing cost for the year is credited by the Government to the Project Account and withheld from housing assistance payments to the Owner as aforesaid (no increased payments shall be made to the Owner on account of any net excess for the year of actual interim debt service over the anticipated debt service under the permanent financing). Nothing in this paragraph g shall be construed as requiring a reduction in the Contract Rents or precluding adjustments of Contract Rents in accordance with Section 1.8.

(2) The computation and recoupment under this paragraph g may be made on an annual or on a quarterly or other periodic basis, but in any event no later than as of the end of each Fiscal Year: Provided, however, that if recoupment is to be made less often than quarterly, the amounts of recoupment shall be computed on at least a quarterly basis and the funds shall be deposited in a special account from which withdrawals may be made only with the authorization of the Government. The manner of computing the amount of recoupment shall be as follows:

(i) Determine the amount by which the debt service for the interim financing for the period in question is less than the anticipated debt service under the permanent financing on which the Contract Rents were based;

(ii) Determine what percentage the amount found under paragraph g(2)(i) of this Section is of the aggregate Contract Rents for all Contract Units for the period in question;

(iii) Apply the percentage found in paragraph g(2)(ii) of this Section to the aggregate Contract Rents for those Contract Units which are included in the Owner's claim(s) for housing assistance payments for the period in question; and

(iv) The amount found in paragraph g(2)(iii) of this Section shall be credited to the Project Account and withheld from the next housing assistance payment or payments to the Owner.

1.7 MAINTENANCE, OPERATION AND INSPECTION.

a. Maintenance and Operation. The Owner agrees (1) to maintain and operate the Contract Units and related facilities so as to provide Decent, Safe, and Sanitary housing, and (2) to provide all the services, maintenance and utilities set forth in Exhibit C. If the Government determines that the Owner is not meeting one or more of these obligations, the Government shall have the right, in addition to its other rights and remedies under this Contract, to abate housing assistance payments in whole or in part.

b. Inspection.

(1) Prior to occupancy of any unit by a Family, the Owner and the Family shall inspect the unit and both shall certify, on forms prescribed by the Government, that they have inspected the unit and have determined it to be Decent, Safe, and Sanitary in accordance with the criteria provided in the prescribed forms. Copies of these reports shall be kept on file by the Owner for at least three years.

[1] Delete this paragraph unless the project is subject to 24 CFR, Section 880.125.

(2) The Government shall inspect or cause to be inspected each Contract Unit and related facilities at least annually and at such other times (including prior to initial occupancy and renting of any unit) as may be necessary to assure that the Owner is meeting his obligation to maintain the units in Decent, Safe, and Sanitary condition and to provide the agreed upon utilities and other services. The Government shall take into account complaints by occupants and any other information coming to its attention in scheduling inspections and shall notify the Owner and the Family of its determination.

c. Units Not Decent, Safe, and Sanitary. If the Government notifies the Owner that he has failed to maintain a dwelling unit in Decent, Safe, and Sanitary condition and the Owner fails to take corrective action within the time prescribed in the notice, the Government may exercise any of its rights or remedies under the Contract, including abatement of housing assistance payments, even if the Family continues to occupy the unit. If, however, the Family wishes to be rehoused in another dwelling unit with section 8 assistance and the Government does not have other section 8 funds for such purposes, the Government may use the abated housing assistance payments for the purpose of rehousing the Family in another dwelling unit. Where this is done, the Owner shall be notified that he will be entitled to resumption of housing assistance payments for the vacated dwelling unit if (1) the unit is restored to Decent, Safe, and Sanitary condition, (2) the Family is willing to and does move back into the restored unit, and (3) a deduction is made for the expenses incurred by the Family for both moves.

d. Notification of Abatement. Any abatement of housing assistance payments shall be effective as provided in written notification to the Owner. The Government shall promptly notify the Family of any such abatement.

e. Overcrowded and Underoccupied Units. If the Government determines that a Contract Unit is not Decent, Safe, and Sanitary by reason of increase in Family size, or that a Contract Unit is larger than appropriate for the size of the Family in occupancy, housing assistance payments with respect to such unit will not be abated, unless the Owner fails to offer the Family a suitable unit as soon as one becomes vacant and ready for occupancy. In the case of an overcrowded unit, if the Owner does not have any suitable units or if no vacancy of a suitable unit occurs within a reasonable time, the Government will assist the Family in finding a suitable dwelling unit and require the Family to move to such a unit as soon as possible. The Owner may receive housing assistance payments for the vacated unit if he complies with the requirements of Section 1.6c(1).

1.8 RENT ADJUSTMENTS.

a. Funding of Adjustments. Housing assistance payments will be made in increased amounts commensurate with Contract Rent adjustments under this Section, up to the maximum amount authorized under Section 1.5a of this Contract.

b. Automatic Annual Adjustments.

(1) Automatic Annual Adjustment Factors will be determined by the Government at least annually; interim revisions may be made as market conditions warrant. Such Factors and the basis for their determination will be published in the Federal Register. These published Factors will be reduced appropriately by the Government where utilities are paid directly by the Families.

(2) On each anniversary date of the Contract, the Contract Rents shall be adjusted by applying the applicable Automatic Annual Adjustment Factor most recently published by the Government. Contract Rents may be adjusted upward or downward, as may be appropriate; however, in no case shall the adjusted Contract Rents be less than the Contract Rents on the effective date of the Contract.

c. Special Additional Adjustments. Special additional adjustments shall be granted, when approved by the Government, to reflect increases in the actual and necessary expenses of owning and maintaining the Contract Units which have resulted from substantial general increases in real property taxes, utility rates, or similar costs (i.e., assessments, and utilities not covered by regulated rates), but only if and to the extent that the Owner clearly demonstrates that such general increases have caused increases in the Owner's operating costs which are not adequately compensated for by automatic annual adjustments. The Owner shall submit to the Government financial statements which clearly support the increase.

d. Overall Limitation. Not withstanding any other provisions of this Contract, adjustments as provided in this Section shall not result in material differences between the rents charged for assisted and comparable unassisted units, as determined by the Government; provided, that this limitation shall not be construed to prohibit differences in rents between assisted and comparable unassisted units to the extent that such differences may have existed with respect to the initial Contract Rents.

e. Incorporation of Rent Adjustment. Any adjustment in Contract Rents shall be incorporated into Exhibit A by a dated addendum to the exhibit establishing the effective date of the adjustment.

f.[1] Adjustment to Reflect Actual Cost of Permanent Financing. This paragraph f shall apply if the project is not permanently financed until after the effective date of the Contract. After the project is permanently financed, the Financing Agency shall submit a certification to the Government as to the actual financing terms. If the actual debt service under the permanent financing is lower than the anticipated debt service on which the Contract Rents were based, the Contract Rents currently in effect shall be reduced commensurately, and the amount of the savings shall be credited to the Project Account. The maximum Contract commitment shall not be reduced. If the actual debt service is higher, the Contract Rents shall not be increased.

1.9 MARKETING AND LEASING OF UNITS.

a. Compliance with Equal Opportunity. Marketing of units and selection of Families by the Owner shall be in accordance with the Owner's Government-approved Affirmative Fair Housing Marketing Plan, shown as Exhibit D, and with all regulations relating to fair housing advertising.

b. Security and Utility Deposits.

(1) The Owner may require Families to pay a security deposit in an amount equal to one month's Gross Family Contribution. If a Family vacates its unit, the Owner, subject to State and local law, may utilize the deposit as reimbursement for any unpaid rent or other amount owed under the Lease. If the Family has provided a security deposit, and it is insufficient for such reimbursement, the Owner may claim reimbursement from the Government, not to exceed an amount equal to the remainder of one month's Contract Rent. Any reimbursement under this Section shall be applied first toward any unpaid rent. If a Family vacates the unit owing no rent or other amount under the Lease or if the amount owed is less than the amount of the security deposit, the Owner shall refund the full amount or the unused balance, as the case may be, to the Family.

(2) In those jurisdictions where interest is payable by the Owner on Security deposits, the refunded amount shall include the amount of interest payable. All security deposit funds shall be deposited by the Owner in a segregated bank account, and the balance of this account, at all times, shall be equal to the total amount collected from tenants then in occupancy, plus any accrued interest. The Owner shall comply with all State and local laws regarding interest payments on security deposits.

(3) Families shall be expected to obtain the funds to pay security and utility deposits, if required, from their own resources and/or other private or public sources.

[1] Leave this paragraph unless the project is subject to 24 CFR, Section 880.125.

| .e of Group/Organization | Racial/Ethnic Identification | Approximate Date of Contact or Proposed Contact | Person Contacted or to be Contacted | Address and Telephone No. | Method of Contact(s) | Indicate the specific group/organization wi take in implementing |
|---|---|---|---|---|---|---|
| .er St. Mark's Baptist .h | Black | 5 mos. prior to |  | 972 E. 123rd St. Cleveland, Ohio 541-5233 | Phone/Mail | To inform their congreg membership of the avail of units and to inform of who to contact to ob additional information. |
| .ville Baptist Church | " | " " " | Rev. E.E. Foreman Pastor | 4797 Lee Road Cleveland, Ohio. 587-0971 | " " |  |
| Baptist Church and ity Center | " | " " " | Rev. Otis Moss, Pastor | 8712 Quincy Cleveland, Ohio 721-3585 | " " | " " " " |
| Baptist Church | " | " " " | Rev. Alfred M. Waller, Sr., Pastor | 5500 Scovill Cleveland, Ohio 881-7337 | " " | " " " " |
| .e Baptist Church | " | " " " | Rev. A.E. Campbell,Jr. Pastor | 7500 Cedar Road Cleveland, Ohio 881-8236 | " " | " " " " |
| .ill Baptist Church | " | " " " | Rev. A. William Jamerson, Pastor | 2541 E. 37th Cleveland, Ohio 391-4722 | " " | " " " " |
| .inity Church | Mixed | " " " | Father Minnich, Pastor | 24821 Columbus Cleveland, Ohio 232-2044 | " " | " " " " |
| .ulate Conception | " | " " " |  | 4129 Superior Cleveland, Ohio 431-5900 | " " | " " " " |
| .nes Church | " | " " " | Father Randell Woods, Pastor | 8000 Euclid Ave. Cleveland, Ohio 721-6040 | " " | " " " " |
| Francis | " | " " " | Father Martin, Pastor | 7119 Superior Cleveland, Ohio 361-4133 | " " | " " " " |

| ::e of Group/Organization | Racial/Ethnic Identification | Approximate Date of Contact or Proposed Contact | Person Contacted or to be Contacted | Address and Telephone No. | Method of Contact(s) | Indicate the specific group/organization w: take in implementing |
| --- | --- | --- | --- | --- | --- | --- |
| Philomena Church' | Mixed | 5 mos. prior to occupancy | Father Lang, Pastor | 13824 Euclid Ave. Cleveland, Ohio 541-3540 | Phone/Mail | To inform their congre membership of the avai of units and to inform of who to contact for additional information |
| Thomas Aquinas Church | " | " " " | Rev. Daniel McBride, Pastor | 9205 Superior Cleveland, Ohio 721-9002 | " " | " " " |
| ..el Episcopal Church | " | " " " | Rev. Dalton D. Downs, Rector | 8614 Euclid Ave. Cleveland, Ohio 421-0524 | " " | " " " |
| ..irew's Episcopal | " | " " " | Rev. Austin R. Cooper, Rector | 2171 E. 49th St. Cleveland, Ohio 391-2632 | " " | " " " |
| ..mes' Episcopal | " | " " " | Father Irvin, Pastor | E. 55th & Payne Cleveland, Ohio 431-3252 | " " | " " " |
| ..ity A M E Church | " | " " " | | 5805 Lexington Cleveland, Ohio 361-0693 | " " | " " " |
| ..etropolitan C M E | " | " " " | A. Montgomery, Minister | 2131 E. 46th St. Cleveland, Ohio 391-9368 | " " | " " " " |
| John's A M E Church | " | " " " | Andrew A. Hughey, Minister | 2261 E. 40th St. Cleveland, Ohio 431-2560 | " " | " " " " |
| James' A M E Church | " | " " " | Rev. Alvia A. Shaw, Pastor | 8401 Cedar Road Cleveland, Ohio 231-3562 | " " | " " " " |
| ..r Methodist Church | " | " " " | | 2572 E. Blvd. Cleveland, Ohio [illegible] | " " | " " " " |

| ...e of Group/Organization | Identification | Contact or Proposed Contact | ... to be Contacted | ... Telephone No. | ... Contact(s) | ... group/organization ... take in implementati... |
|---|---|---|---|---|---|---|
| ...tecostal Church of Christ | Mixed | 5 mos. prior to occupancy | Rev. Charles Watkins, Pastor | 887 Parkwood Dr. Cleveland, Ohio 541-4739 | Phone/Mail | To inform their congr... membership of the ava... of units and to infor... of who to contact for additional informatio... |
| Cleveland Community ...ter | Black | " " " | Director, Helen Brown | 14108 Euclid Ave. E.Cleveland,Ohio 451-3049 | " " | " " " " |
| ...ville United ...yterian Church and ...nity Center | " | " " " | Rev. Henry Binckney, Pastor | 10504 Helena Cleveland, Ohio 451-8540 | " " | " " " " |
| ...Mark's Presbyterian ...rch | " | " " " | | 1319 E. Blvd. Cleveland, Ohio 791-0128 | " " | " " " " |
| ...vation Army - Hough ...ti-Purpose Center | " | " " " | Director, Mr. Edward Bailey | 6000 Hough Ave. Cleveland, Ohio 432-0500 | " " | " " " " |
| ...e of Isleam | " | " " " | Ali Rashed, Minister | 4115 Lee Road Cleveland, Ohio 295-0794 | " " | " " " " |
| ...land Baptist ...iation | Mixed | " " " | Rev. Stanley Borden, Director | 2246 Euclid Ave. Cleveland, Ohio 241-2380 | " " | " " " " |

| e of Group/ Organization | Racial/Ethnic Indentification | Approximate Date of Contact or Proposed Contact | Person Contacted or to be Contacted | Address and Telephone No. | Method of Contact(s) | Indicate the specific group/organization wil take in implementing t plan. |
|---|---|---|---|---|---|---|
| nish American Committee a Better Community | Spanish/ American | 5 mos. prior to occupancy | Daniel Mazzoiana, Director | 4407 Lorain Ave. Cleve., O. 44102 961-2100 | Phone/Mail | To inform their cong membership of the ava of units and to infor who to contact to obt additional informatio |
| n League of Greater veland | Black | " " " " | William K. Wolfe | 2060 Euclid Ave. Cleveland, Ohio 861-4200 | " " | " " " |
| tral Area Development p. | Mixed | " " " " | James Calgie | 3708 Central Cleveland, Ohio 431-6088 | " " | " " " |
| Road Baptist Church | Balck | " " " " | Rev. Wm Sanders, | 3970 Lee Road Cleveland O. 44128 751-2688 | " " | " " " |
| yahoga Metropolitan using Authority | Mixed | " " " " | Robert J. Fitzgerald Director | 1441 West 25th St. Cleveland, Ohio 621-8231 | " " | " " " |

(DESCRIPTION OF SPONSOR RESPONSIBILITY)

e: Fair Housing Marketing Requirements

o all employees

ı order to comply with the requirements of the Department of Housing ıd Urban Development, be advised that it is the policy of this Company › be in full compliance with all local, state, and federal Fair Housing ıws; including Executive Order 11063, the Civil Rights Act of 1968, and ıe Affirmative Marketing Plan. Accordingly, in all of your marketing :tivities, you will refrain from discriminating against any potential ›nants on the basis of race, color, religion, sex or national origin. ı order to more fully inform you as to these matters, you will find ·tached hereto a copy of the Affirmative Fair Housing Marketing Plan ıich has been filed with the Federal Housing Administration.

order to implement this plan, please note that all advertising which placed in connection with the renting of this project shall indicate at our policy is one of open occupancy. In determining the media to used in reaching the potential renting public, minority as well as jority oriented media shall be used. Further, in contacting groups ich may be helpful in securing prospective tenants, letters should sent to all local churches and major minority civic and social groups forming them of the availability of our rental units.

(2) The lease executed between the Owner and each selected Family shall be on the form of Lease approved by the Government.

(3) The Owner shall make a reexamination of Family Income, composition, and the extent of medical or other unusual expenses incurred by the Family, at least annually (except that such reviews may be made at intervals of no longer than two years in the case of elderly Families), and appropriate redeterminations shall be made by the Owner of the amount of Family contribution and the amount of housing assistance payment, all in accordance with schedules and criteria established by the Government. In connection with the reexamination, the Owner shall determine what percentage of Families in occupancy are Very Low-Income Families. If there are fewer than 30 percent Very Low-Income Families in occupancy, the Owner shall report the fact to the Government and shall adopt changes in his admission policies to achieve, as soon as possible, at least 30 percent occupancy by such Families.

d. Rent Redetermination after Adjustment in Allowance for Utilities and Other Services. In the event that the Owner is notified of a Government determination making an adjustment in the Allowance for Utilities and Other Services applicable to any of the Contract Units, the Owner shall promptly make a corresponding adjustment in the amount of rent to be paid by the affected Families and the amount of housing assistance payments.

e. Processing of Applications and Complaints. The Owner shall process applications for admission, notifications to applicants, and complaints by applicants in accordance with applicable Government requirements and shall maintain records and furnish such copies or other information as may be required by the Government.

f. Government Review: Incorrect Payments. In making housing assistance payments to Owners, the Government will review the Owner's determinations under this Section. If as a result of this review, or other reviews, audits or information received by the Government at any time, it is determined that the Owner has received improper or excessive housing assistance payments, the Government shall have the right to deduct the amount of such overpayments from any amounts otherwise due the Owner, or otherwise effect recovery thereof.

1.10 TERMINATION OF TENANCY. The Owner shall be responsible for termination of tenancies, including evictions. However, conditions for payment of housing assistance payments for any resulting vacancies shall be as set forth in Section 1.6c.

1.11 REDUCTION OF NUMBER OF CONTRACT UNITS FOR FAILURE TO LEASE TO ELIGIBLE FAMILIES.

a. After First Year of Contract. If at any time, beginning six months after the effective date of this Contract, the Owner fails for a continuous period of six months to have at least 80 percent of the Contract Units leased or available for leasing by Families, the Government may on 30 days notice reduce the number of Contract Units to not less than the number of units under lease or available for leasing by Families, plus 10 percent of such number if the number is 10 or more, rounded to the next highest number.

b. At End of Initial and Each Renewal Term. At the end of the initial term of the Contract and of each renewal term, the Government may, by notice to the Owner, reduce the number of Contract Units to not less than (1) the number of units under lease or available for leasing by Families at that time or (2) the average number of units so leased or available for leasing during the last year, whichever is the greater number, plus 10 percent of such number if the number is 10 or more, rounded to the next highest number.

c. Restoration of Units. The Government will agree to an amendment of the Contract to provide for subsequent restoration of any reduction made pursuant to paragraph a or b of this Section if the Government determines that the restoration is justified as a result of changes in demand and in the light of the Owner's record of compliance with his obligations under this Contract and if annual contributions contract authority is available; and the Government will take such steps authorized by section 8(c)(6) of the Act as may be necessary to carry out this assurance (see Section 1.5).

WARNING: 18 U.S.C. 1001 provides, among other things, that whoever knowingly and willfully makes or uses a document or writing containing any false, fictitious, or fraudulent statement or entry, in any matter within the jurisdiction of any department or agency of the United States, shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

OWNER ______________________________

By ______________________________

______________________________
*(Official Title)*

Date ______________________________, 19____

United States of America
Secretary of Housing and Urban Development

By ______________________________

______________________________
*(Official Title)*

Date ______________________________, 19____

SEE EXECUTION OF CONTRACT IN STAGES

[If the project is to be completed and accepted in stages, execution of the Contract with respect to the several stages appears on the following pages of this Contract.]

EFFECTIVE DATE. The effective date of this Contract is October ___, 19 82.
[Insert date which shall be no earlier than the date of Government acceptance of the project.]

This pahse will include 60 units total.

OWNER Beach House Development Company

By [signature]
Vice President, Associated Estates Corp., General Partner, Beach House Dev. Co.
(Official Title)

Date December 15, 19 82

United States of America
Secretary of Housing and Urban Development

By [signature]
Michael D. Diercourt
Acting Service Office Supervisor
(Official Title)

Date 12-16 19 82

**EXECUTION OF CONTRACT WITH RESPECT TO CONTRACT UNITS COMPLETED AND ACCEPTED IN STAGES**

**STAGE 2**

This Contract is hereby executed with respect to the units described in Exhibit A-2.

EFFECTIVE DATE. The Effective date of this Contract is ____________, 19____.
[Insert date which shall be no earlier than the date of Government acceptance of the project.]

OWNER Beach House Development Company

By Vice President, Associated Estates Corp., General Partner, Beach House Dev. Co.
(Official Title)

Date ____________, 19____

United States of America
Secretary of Housing and Urban Development

By ____________

____________
(Official Title)

Date ____________

**EXECUTION OF CONTRACT WITH RESPECT TO CONTRACT UNITS COMPLETED AND ACCEPTED IN STAGES**

**STAGE 3**

This Contract is hereby executed with respect to the units described in Exhibit A-3.

EFFECTIVE DATE. The effective date of this Contract is ____________, 19____.
[Insert date which shall be no earlier than the date of Government acceptance of the project.]

OWNER ____________

By ____________

____________
(Official Title)

Date ____________, 19____

United States of America
Secretary of Housing and Urban Development

By ____________

EFFECTIVE DATE. The effective date of this Contract is ______
[Insert date which shall be no earlier than the date of Government acceptance of the project.]

This phase will include 60 units total.

OWNER Beach House Development Company

By Vice President, Associated Estates Corp., General Partner, Beach House Dev. Co.
(Official Title)

Date December 15, 1982

United States of America
Secretary of Housing and Urban Development

By Michael D. Diercourt
Acting Service Office Supervisor
(Official Title)

Date 12-16, 1982

EXECUTION OF CONTRACT WITH RESPECT
TO CONTRACT UNITS COMPLETED AND ACCEPTED
IN STAGES

STAGE 2

This Contract is hereby executed with respect to the units described in Exhibit A-2.

EFFECTIVE DATE. The Effective date of this Contract is October 25, 1982.
[Insert date which shall be no earlier than the date of Government acceptance of the project.]

This phase will include 48 units total.

OWNER Beach House Development Company

By Vice President, Associated Estates Corp., General Partner, Beach House Dev. Co.
(Official Title)

Date 1-4, 1983

United States of America
Secretary of Housing and Urban Development

By Michael D. Diercourt
Acting Service Office Supervisor
(Official Title)

Date 1-4-83

EXECUTION OF CONTRACT WITH RESPECT
TO CONTRACT UNITS COMPLETED AND ACCEPTED
IN STAGES

STAGE 3

This Contract is hereby executed with respect to the units described in Exhibit A-3.

EFFECTIVE DATE. The effective date of this Contract is ______, 19____
[Insert date which shall be no earlier than the date of Government acceptance of the project.]

OWNER ______

By ______

______
(Official Title)

Date ______, 19____

United States of America
Secretary of Housing and Urban Development

By ______

21. NONDISCRIMINATION IN HOUSING.

a. The Owner shall not in the selection of Families, in the provision of services, or in any other manner, discriminate against any person on t grounds of race, color, creed, religion, sex, or national origin. No person shall be automatically excluded from participation in, or be denie the benefits of, the Housing Assistance Payments Program because of membership in a class such as unmarried mothers, recipients of publ assistance, etc.

b. The Owner shall comply with all requirements imposed by Title VIII of the Civil Rights Act of 1968, and any rules and regulations pursua thereto.

c. The Owner shall comply with all requirements imposed by Title VI of the Civil Rights Act of 1964, Public Law 88-352, 78 Stat. 241; th regulations of the Department of Housing and Urban Development issued thereunder, 24 CFR, Subtitle A, Part 1, Section 1.1, et seq.; th requirements of said Department pursuant to said regulations; and Executive Order 11063 to the end that, in accordance with that Act, th regulations and requirements of said Department thereunder, and said Executive Order, no person in the United States shall, on the ground of race, color, creed, religion or national origin, be excluded from participation in, or be denied the benefits of, the Housing Assistanc Payments Program, or be otherwise subjected to discrimination. This provision is included pursuant to the regulations of the Department o Housing and Urban Development, 24 CFR, Subtitle A, Part 1, Section 1.1, et seq.; issued under Title VI of the said Civil Rights Act o 1964, and the requirements of said Department pursuant to said regulations; and the obligation of the Owner to comply therewith inures tc the benefit of the Government, of the said Department, and the PHA, any of which shall be entitled to invoke any remedies available by law to redress any breach thereof or to compel compliance therewith by the Owner.

22. TRAINING, EMPLOYMENT, AND CONTRACTING OPPORTUNITIES FOR BUSINESSES AND LOWER-INCOME PERSONS.[4]

a. The project assisted under this Contract is subject to the requirements of section 3 of the Housing and Urban Development Act of 1968, as amended, 12 U.S.C. 170lu. Section 3 requires that, to the greatest extent feasible, opportunities for training and employment be given lower-income residents of the project area and contracts for work in connection with the project be awarded to business concerns which are located in, or owned in substantial part by persons residing in, the area of the project.

b. Notwithstanding any other provision of this Contract, the Owner shall carry out the provisions of said section 3 and the regulations issued pursuant thereto by the Secretary of Housing and Urban Development set forth in 24 CFR, Part 135 (published in 38 Federal Register 29220, October 23, 1973), and all applicable rules and orders of the Secretary issued thereunder prior to the execution of this Contract. The requirements of said regulations include, but are not limited to, development and implementation of an affirmative action plan for utilizing business concerns located within, or owned in substantial part by persons residing in, the area of the project; the making of a good faith effort, as defined by the regulations, to provide training, employment, and business opportunities required by section 3; and incorporation of the "section 3 clause" specified by section 135.20(b) of the regulations and paragraph d of this Section in all contracts for work in connection with the project. The Owner certifies and agrees that he is under no contractual or other disability which would prevent him from complying with these requirements.

c. Compliance with the provisions of section 3, the regulations set forth in 24 CFR, Part 135, and all applicable rules and orders of the Secretary issued thereunder prior to approval by the Government of the application for this Contract, shall be a condition of the Federal financial assistance provided to the project, binding upon the Owner, his successors and assigns. Failure to fulfill these requirements shall subject the Owner, his contractors and subcontractors, his successors, and assigns to the sanction specified by this Contract, and to such sanctions as are specified by 24 CFR, Section 135.135.

d. The Owner shall incorporate or cause to be incorporated into any contract or subcontract for work pursuant to this Contract in excess of $50,000 cost, the following clause:

"EMPLOYMENT OF PROJECT AREA RESIDENTS AND CONTRACTORS

"A. The work to be performed under this Contract is on a project assisted under a program providing direct Federal financial assistance from the Department of Housing and Urban Development and is subject to the requirements of section 3 of the Housing and Urban Development Act of 1968, as amended, 12 U.S.C. 170lu. Section 3 requires that, to the greatest extent feasible, opportunities for training and employment be given lower-income residents of the project area and contracts for work in connection with the project be awarded to business concerns which are located in, or owned in substantial part by persons residing in, the area of the project.

"B. The parties to this Contract will comply with the provisions of said section 3 and the regulations issued pursuant thereto by the Secretary of Housing and Urban Development set forth in 24 CFR, Part 135, and all applicable rules and orders of the Department issued thereunder prior to the execution of this Contract. The parties to this Contract certify and agree that they are under no contractual or other disability which would prevent them from complying with these requirements.

"C. The contractor will send to each labor organization or representative of workers with which he has a collective bargaining agreement or other contract or understanding, if any, a notice advising the said labor organization or workers' representative of his commitments under this section 3 clause and shall post copies of the notice in conspicuous places available to employees and applicants for employment or training.

"D. The contractor will include this section 3 clause in every subcontract for work in connection with the project and will, at the direction of the applicant for or recipient of Federal financial assistance, take appropriate action pursuant to the subcontract upon a finding that the subcontract is in violation of regulations issued by the Secretary of Housing and Urban Development, 24 CFR, Part 135. The contractor will not subcontract with any subcontractor where it has notice or knowledge that the latter has been found in violation of regulations under 24 CFR, Part 135, and will not let any subcontract unless the subcontractor has first provided it with a preliminary statement of ability to comply with the requirements of these regulations.

[4] Strike this Section if the Contract Rents on the effective date of this Contract, over the maximum term of this Contract, are $500,000 or less

conducting [illegible] Executive Orders, and rules ... regulations pursuant thereto.

2.4 FLOOD INSURANCE. If the project is located in an area that has been identified by the Secretary of Housing and Urban Development as an a[rea] having special flood hazards and if the sale of flood insurance has been made available under the National Flood Insurance Act of 1968, the Ow[ner] agrees that the project will be covered, during its anticipated economic or useful life, by flood insurance in an amount at least equal to development or project cost (less estimated land cost) or to the maximum limit of coverage made available with respect to the particular type property under the National Flood Insurance Act of 1968, whichever is less.

2.5 CLEAN AIR ACT AND FEDERAL WATER POLLUTION CONTROL ACT.[3] In compliance with regulations issued by the Environmen[tal] Protection Agency ("EPA"), 40 CFR, Part 15, 39 F.R. 11099, pursuant to the Clean Air Act, as amended ("Air Act"), 42 U.S.C. 1857, et seq., Federal Water Pollution Control Act, as amended ("Water Act"), 33 U.S.C. 1251, et seq., and Executive Order 11738, the Owner agrees that:

a. Any facility to be utilized in the performance of this Contract or any subcontract shall not be a facility listed on the EPA List of Violat[ing] Facilities pursuant to section 15.20 of said regulations;

b. He will promptly notify the PHA of the receipt of any communication from the EPA indicating that a facility to be utilized for [this] Contract is under consideration to be listed on the EPA List of Violating Facilities;

c. He will comply with all the requirements of section 114 of the Air Act and section 308 of the Water Act relating to inspection, monitor[ing], entry, reports, and information, as well as all other requirements specified in section 114 and section 308 of the Air Act and the Water A[ct] respectively, and all regulations and guidelines issued thereunder; and

d. He will include or cause to be included the provisions of this Section in every nonexempt subcontract, and that he will take such action [as] the Government may direct as a means of enforcing such provisions.

2.6 PHA AND GOVERNMENT ACCESS TO PREMISES AND OWNER'S RECORDS.

a. The Owner shall furnish such information and reports pertinent to the Contract as reasonably may be required from time to time by [the] PHA or the Government.

b. The Owner shall permit the PHA or the Government or any of their duly authorized representatives to have access to the premises and, [for] the purpose of audit and examination, to have access to any books, documents, papers and records of the Owner that are pertinent [to] compliance with this Contract, including the verification of information pertinent to the housing assistance payments.

2.7 FAILURE OR INABILITY OF PHA TO COMPLY WITH CONTRACT.

The following provisions of the ACC are hereby made a part of this Contract:

"(a) Rights of Owner if PHA Defaults Under Agreement or Contract.

"(2) In the event of failure of the PHA to comply with the Contract with the Owner, or if such Contract is held to be void, voidable or ultra vires, or if the power or right of the PHA to enter into such Contract is drawn into question in any proceeding, or if the PHA asserts or claims that such Contract is not binding upon the PHA for any such reason, the Government may, after notice to the PHA giving it a reasonable opportunity to take corrective action, determine that occurrence of any such event constitutes a Substantial Default hereunder. Where the Government so determines, it s[hall] have the right to assume the PHA's rights and obligations under such Contract, perform the obligations and enforce [the] rights of the PHA, and exercise such other powers as the Government may have to cure the Default; however, wheth[er] or not the Government elects to proceed in this manner, the Government shall, if it determines that the Owner is not [in] default, continue for the duration of such Contract to pay Annual Contributions for the purpose of making housing assistance payments with respect to dwelling units under such Contract.

"(3) All rights and obligations of the PHA assumed by the Government pursuant to this Section 2.16(a) will be returned as constitute[d at] the time of such return (i) when the Government is satisfied that all defaults have been cured and that the Project will thereafter [be] administered in accordance with all applicable requirements, or (ii) when the Housing Assistance Payments Contract is at an e[nd], whichever occurs sooner.

"(4) The provisions of this Section 2.16(a) are made with, and for the benefit of, the Owner, the PHA (where it is the lender and then only i[n its] capacity as lender), or the Owner's other assignees, if any, who will have been specifically approved by the Government prior to such assi[gn]ment. If such parties are not in default, they may, in order to enforce the performance of these provisions,(i) demand that the Governm[ent] after notice to the PHA giving it a reasonable opportunity to take corrective action, make a determination whether a Substantial Default [ex]ists under paragraph (a)(1)or (a)(2) of this Section, (ii) if the Government determines that a Substantial Default exists, demand that [the] Government take action as authorized in paragraph (a)(1) or (a)(2), and (iii) proceed against the Government by suit at law or in equ[ity]

[3] Strike this Section if the Contract Rents on the effective date of this Contract, over the maximum total term of this Contract, are $100,000 or less.

b. Upon a determination by the PHA that a default has occurred, the PHA shall notify the Owner, with a copy to the Government, of (1) the nature of the default, (2) the actions required to be taken and the remedies to be applied on account of the default (including actions by the Owner to cure the default, and, where appropriate, abatement of housing assistance payments in whole or in part and recovery of overpayments), and (3) the time within which the Owner shall respond with a showing that he has taken all the actions required of him. If the Owner fails to respond or take action to the satisfaction of the PHA and the Government, the PHA shall have the right to terminate the Contract in whole or in part or to take other corrective action to achieve compliance, in its discretion or as directed by the Government.

c. (The provisions of this paragraph c shall apply only if the PHA is the lender.) Notwithstanding any other provisions of this Contract, in the event the Government determines that the Owner is in default of his obligations under the Contract, the Government shall have the right, after notice to the Owner and the PHA giving them a reasonable opportunity to take corrective action, to abate or terminate housing assistance payments and recover overpayments in accordance with the terms of the Contract. In the event the Government takes any action under this Section, the Owner and the PHA hereby expressly agree to recognize the rights of the Government to the same extent as if the action were taken by the PHA. The Government shall not have the right to terminate the Contract except by proceeding in accordance with Section 2.16 (b) of the ACC and paragraph b of this Section.

2.9 REMEDIES NOT EXCLUSIVE AND NON-WAIVER OF REMEDIES. The availability of any remedy under this Contract or the ACC shall not preclude the exercise of any other remedy under this Contract or the ACC or under any provisions of law, nor shall any action taken in the exercise of any remedy be deemed a waiver of any other rights or remedies. Failure to exercise any right or remedy shall not constitute a waiver of the right to exercise that or any other right or remedy at any time.

2.10 DISPUTES.

a. Except as otherwise provided herein, any dispute concerning a question of fact arising under this Contract which is not disposed of by agreement of the PHA and the Owner may be submitted by either party to the Department of Housing and Urban Development field office director who shall make a decision and shall mail or otherwise furnish a written copy thereof to the Owner and the PHA.

b. The decision of the field office director shall be final and conclusive unless, within 30 days from the date of receipt of such copy, either party mails or otherwise furnishes to the Government a written appeal addressed to the Secretary of Housing and Urban Development. The decision of the Secretary or duly authorized representative for the determination of such appeals shall be final and conclusive, unless determined by a court of competent jurisdiction to have been fraudulent, or capricious, or arbitrary, or so grossly erroneous as necessarily to imply bad faith, or not supported by substantial evidence. In connection with any appeal proceeding under this Section, the appellant shall be afforded an opportunity to be heard and to offer evidence in support of his appeal. Pending final decision of a dispute hereunder, both parties shall proceed diligently with the performance of the Contract and in accordance with the decision of the field office director.

c. This Section does not preclude consideration of questions of law in connection with the decisions rendered under paragraphs a and b of this Section: Provided, however, that nothing herein shall be construed as making final the decision of any administrative official, representative or board, on a question of law.

2.11 INTEREST OF MEMBERS, OFFICERS, OR EMPLOYEES OF PHA, MEMBERS OF LOCAL GOVERNING BODY OR OTHER PUBLIC OFFICIALS. No member, officer, or employee of the PHA, no member of the governing body of the locality (city and county) in which the project is situated, no member of the governing body of the locality in which the PHA was activated, and no other public official of such locality or localities who exercises any functions or responsibilities with respect to the project, during his tenure or for one year thereafter, shall have any interest, direct or indirect, in this Contract or in any proceeds or benefits arising therefrom.

2.12 INTEREST OF MEMBER OF OR DELEGATE TO CONGRESS. No member of or delegate to the Congress of the United States of America or resident commissioner shall be admitted to any share or part of this Contract or to any benefits which may arise therefrom.

2.13 ASSIGNMENT, SALE, OR FORECLOSURE.

a. The Owner agrees that he has not made and will not make any sale, assignment, or conveyance or transfer in any other form, of the Contract or the project or any part thereof or any of his interest therein, without the prior consent of the PHA and the Government: Provided, however, that in the case of an assignment as security for the purpose of obtaining financing of the project, the PHA and the Government shall consent in writing if the terms of the financing have been approved by the Government.

b. The Owner agrees to notify the PHA and the Government promptly of any proposed action covered by paragraph a of this Section. The Owner further agrees to request the written consent of the PHA and the Government in regard thereto.

c. (1) A transfer by the Owner, in whole or in part, or a transfer by a party having a substantial interest in said Owner, or transfers by more than one party of interests aggregating a substantial interest in said Owner, or any other similarly significant change in the ownership of interests in the Owner, or in the relative distribution thereof, or with respect to the parties in control of the Owner or the degree thereof, by any other method or means (*e.g., increased capitalization, merger with another corporation or other entity, corporate or other amendments, issuance of new or additional ownership interests or classification of ownership interests or otherwise*) shall be deemed an assignment, conveyance, or transfer for purposes of this Section 2.13. An assignment by the Owner to a limited partnership, in which no limited partner has a 25 percent or more interest and of which the Owner is the sole general partner, shall not be considered an assignment, conveyance or transfer.

(2) The term "substantial interest" means the interest of any general partner, any limited partner having a 25 percent or more interest in the organization, any corporate officer or director, and any stockholder having a 10 percent or more interest in the organization.

(3) The Owner, and the party signing this Contract on behalf of said Owner, represent that they have the authority of all of the parties having ownership interests in the Owner to agree to this provision on their behalf and to bind them with respect thereto.

Beach House Development
(Lake Shore Village)
OH 12-0002-012

EXHIBIT A

| SIZE | NUMBER OF UNITS | APPLICABLE RENT |
|---|---|---|
| 2 BR | 102 | $567.00 |
| 3 BR | 6 | $640.00 |

EXHIBITS B, & C OF HAP CONTRACT

The number of units by size and their applicable rents are reflected in the letter of Notice of Final Approval dated 9/22/80 , or in later letters issued by HUD.

The project description is reflected in the latest approved HUD Form 2013 and various site descriptions on file as noted below.

The services, maintenance and utilities to be provided by the Owner are reflected in the latest approved HUD Form 2013 on file as noted below, as well as those additional services, maintenance and utilities customarily provided in buildings of this type.

The official Final Proposal, together with all contained documents are on file in the Division of Processing Controls and Reports Cleveland Insuring Office, U. S. Department of HUD, 777 Rockwell Avenue, Cleveland, Ohio 44114.